# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Dawn Smith, Mark Tarras, Jim Cox,
Justin Durbin, Edward Willson, DeWayne Klipple,
and Patrick Parris,

                              Plaintiffs,

                                            Civ. No. 04-1403 (RHK/AJB)
                                            **MEMORANDUM OPINION
                                            AND ORDER**

v.

Heartland Automotive Services, Inc., d/b/a
Jiffy Lube,

                              Defendant.

Steven A. Smith, Donald H. Nichols, Paul J. Lukas, Rachhana T. Srey, Jill M. Novak, Sarah M. Fleegel, Michele R. Fisher, Nichols Kaster & Anderson, PLLP, Minneapolis, Minnesota, for Plaintiffs.

Kimberly A. Jones, Hillary L. Hayes, and Christi J. Hilker, Blackwell Sanders Peper Martin LLP, Kansas City, Missouri; and Michael S. Ryan, Murnane, Conlin, White & Brandt, PA, St. Paul, Minnesota, for Defendant.

## Introduction

Seven former Jiffy Lube Store Managers (collectively "Plaintiffs") have sued

Defendant Heartland Automotive Services, Inc. ("Heartland"), under the Fair Labor

Standards Act ("FLSA"). Plaintiffs allege that they have been improperly classified as

exempt executives and thus deprived of overtime pay. Heartland now moves for summary

judgment, arguing that Plaintiffs were properly classified as exempt executives, that any

mis-classification of Plaintiffs' exempt-status was not willful, and that the exemption

classification was made in good faith.  For the reasons that follow, the Court will deny in part and grant in part Heartland's Motions.

## Background

**A.      Plaintiffs and Their Claims**

Plaintiffs Dawn Smith, Mark Tarras, Jim Cox, Justin Durbin, Ed Willson, DeWayne Klipple, and Patrick Parris, are former Jiffy Lube Store Managers.  Heartland owns and operates Jiffy Lube stores throughout the Minnesota region.  Generally, each store has a crew consisting of one Store Manager, one or more assistant managers, and a number of lube technicians.  (See Oatman Aff. (Cox) ¶ 4.)  The Store Manager is the only position in the store classified as exempt from overtime.  (Isom Dep. Tr. at 28-29.)  Plaintiffs worked as Store Managers in various stores in Minnesota.[1]

Store Managers are supervised by District Managers, who are, in turn, supervised by Regional Managers.  Almost all of the Plaintiffs had more than one District Manager during their tenure as Store Managers.  However, all but one of the Plaintiffs (Durbin) had Ken Lehman as a District Manager for a significant portion of their time as Store Managers.  Cox and Smith each also had Paul Gnat as a District Manager for portions of their time as

---

[1]Cox worked at stores in Hopkins, Minneapolis, Burnsville, and Hastings; Durbin worked at a store in Minneapolis; Klipple worked at stores in Eagan, Edina, and Shokopee; Parris worked at stores in Eagan, Apple Valley, and Savage; Smith worked at stores in Stillwater, Fridley, and White Bear Lake; Tarras worked at stores in Fridley, Golden Valley, Hopkins, St. Paul, and Edina; and Willson worked at a store in Edina.

Store Managers.[2]  Durbin, who did not have Lehman or Gnat as a District Manager, had three different District Managers during his time with the company: Mark Richey, Phil Narey, and Keith Robinson.

Heartland's Store Manager job description requires Store Managers to give "overall direction to their store to provide efficient and quality services to Jiffy Lube customers." (Hayes Aff. (Smith) Ex. 3.)  The job description lists other managerial duties for Store Managers, including to "provide daily supervision and training to personnel, including hiring, scheduling, coaching, counseling, corrective action, performance evaluations, terminations and monitor staffing levels and adjust accordingly in a timely manner."[3]  (Id.) Store Managers are also evaluated on their "management duties" based on three categories: "Employee Development, Administrative, and Management Skills."  (Hayes Aff. (Cox) Ex. 2.)

Plaintiffs maintain that they did not perform many of the duties listed on the job description as Store Managers.  They point out that the job description also states that Store Managers are required to:

provide services to customer vehicles, including checking and changing

---

[2]Most of the Plaintiffs had other District Managers for (generally short) periods of time during their tenure as Store Managers.

[3]The job description also lists the following duties for Store Managers: "Provide overall direction to Jiffy Lube personnel to meet and exceed store goals"; "Monitor workflow to ensure that vehicles are serviced within specific time limits"; "Provide prompt and courteous customer service; answer questions; resolve problems and complaints; ensure consistent recommendation of services needed to the customer"; and "Maintain adequate inventory levels; order supplies as needed."  (Hayes Aff. (Smith) Ex. 3.)

> fluids, filters, airing tires, vacuuming vehicle interior, cleaning windows,
> provide specialized services including air conditioning recharge,
> transmission and radiator services, input customer and maintenance
> information into computer, explain services to customer and accept payment
> for services.

(Hayes Aff. (Smith) Ex. 3.)  According to Plaintiffs, this portion of the job description

accurately explains how they spent 80 to 90 percent of their time as Store Managers; the

vast majority of their time was spent servicing cars and performing the same job duties as

non-exempt employees.  (See, e.g., Cox. Dep. Tr. at 242-43.)

Plaintiffs were paid salaries in the $30,000 to $40,000 range, and were not

compensated for overtime.  (See, e.g., Oatman Aff. (Cox) ¶ 11.)  In general, Plaintiffs

worked more than 40 hours per week[4], and were encouraged, if not required, by their

District Managers to work long hours in order to control labor costs in their stores.  (See,

e.g., Durbin Dep. Tr. at 106.)  As Store Managers, Plaintiffs were eligible for—and some

received—bonuses based on the performance of their stores.  (See, e.g., Oatman Aff. (Cox)

¶ 13.)

## B.    District Manager Oversight

Each District Manager was responsible for multiple stores, and thus supervised

multiple Store Managers.  At times, some District Managers oversaw as few as three or as

many as ten stores.  Plaintiffs Cox, Klipple, Smith, Tarras, and Willson were subject to

close supervision from District Manager Lehman.  These Plaintiffs testified that Lehman

---

[4]Counsel for Plaintiffs represented at oral argument that, had each Plaintiff been
paid an hourly rate plus overtime for the work they performed as Store Managers, they
would have earned more money than they did as salaried exempt employees.

came to their stores on an almost daily basis and stayed for hours at a time. (<u>See, e.g.</u>, Cox.

Dep. Tr. at 79.)  However, Parris and Durbin were not subjected to such close scrutiny from

Lehman or other District Managers.  Parris's testimony indicates that Lehman stopped by

his stores once a week, and that District Manager Holdorf stopped by twice a week.  (Parris

Dep. Tr. at 52-54, 61-63.)  Durbin's testimony is that District Manager Robinson was very

rarely at his store—he saw Robinson on "Fridays for about ten minutes," and sometimes

talked to him at two hour intervals throughout the day, but "it really depended on how your

numbers looked to him.  If they didn't look very good, he called more frequently.  If they

looked like they were on pace for the day, then he would call less frequently."  (Durbin

Dep. Tr. at 49-50.)

   With respect to all of the Plaintiffs, there is evidence to suggest that Lehman and

other District Managers at times exercised a heavy hand in scheduling employees at the

stores.  It appears that the District Manager's goal in closely supervising the scheduling of

employees was to control labor costs.  (<u>See, e.g.</u>, Cox Dep. Tr. at 215, 250-51.)  Plaintiffs

would draft an initial schedule, which they would then submit to their District Manager

(oftentimes Lehman), who would make any changes as he deemed necessary.  (<u>Id.</u>)

Furthermore, Plaintiffs were often subject to the discretion of the District Manager's

scheduling decisions on a day-to-day basis, depending on the performance of their stores

on a given day.  Some District Managers also exercised a significant amount of day-to-day

control over decision making with respect to which hourly employees should be sent home

in a given day.

The evidence also suggests that Plaintiffs had limited or no authority to hire or fire employees; District Managers did the hiring (and the interviewing), and there could be no firing without significant District Manager oversight.  (See, e.g., Cox. Dep. Tr. at 244.) With respect to discipline, Plaintiffs testified that they possessed the authority to talk with employees at the stores regarding what they were doing wrong, but any formal discipline or "write-ups" had to go through the District Managers.  (See, e.g., id. at 250.)

**C.      This Action**

In March 2004, Plaintiffs brought this action alleging that they were improperly classified as exempt from overtime under the FLSA.  (Doc. No. 1.)  They sought to proceed as a collective action on behalf of themselves and other employees similarly situated pursuant to § 216(b) of the FLSA.[5]  By the end of the period during which other Store Managers could "opt-in," or join the case, the collective action consisted of 261 current and former Store Managers from 13 different states, supervised by over 40 different District Mangers.  Heartland filed a Motion to Decertify the collective action and, in

_____

[5]Section 216(b) of the FLSA provides:

> Any employer who violates [the minimum wage or maximum hours provisions of this title] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. . . . An action to recover [such] liability may be maintained . . . in any . . . court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.

29 U.S.C. § 216(b) (emphasis added).

December 2005, this Court determined that Plaintiffs had not met their burden of

establishing that they were so similarly situated that a collective action was appropriate;

accordingly, the Motion to Decertify was granted.  (See Doc. No. 277.)  The

decertification left the seven current individual Plaintiffs in the lawsuit.   As stated above,

each of the current individual Plaintiffs worked in Minnesota, under the same Regional

Managers, and shared some of the same District Managers at various points during

employment with Heartland.  Heartland has now brought motions for summary judgment

with respect to each of the Plaintiffs.

**Standard of Decision**

Summary judgment is proper if, drawing all reasonable inferences favorable to the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The moving party bears the burden of showing that the material facts in the case are

undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety

Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the

nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th

Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

## Analysis

FLSA's overtime regulations require employers to compensate an employee who

works more than forty hours per week "at a rate not less than one and one-half times the

regular rate at which he is employed."  29 U.S.C. § 207(a).  The "time and a half"

compensation requirement does not apply, however, to "any employee in a bona fide

executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).  In claiming the

"bona fide executive" exemption as an affirmative defense, an employer bears the burden of

establishing that the employee in question is properly classified under such exemption.

Corning Glass Works v. Brennan, 417 U.S. 188, 196-97 (1974).  The exemptions are

narrowly construed by the courts, Mitchell v. Lublin, McGaughy & Assoc., 358 U.S. 207,

211 (1959), and are applied only where it "plainly and unmistakably comes within [the

statute's] terms and spirit" to deny the employee overtime, Arnold v. Ben Kanowsky, Inc.,

361 U.S. 388, 392 (1960).

Under the FLSA, an employer may demonstrate that the "executive" exemption

applies by satisfying either a six-part test (the "long test") specified in 29 C.F.R. § 541.1,

or a three-part test (the "short test") detailed in 29 C.F.R. § 541.1(f).[6]  Where, as here, it is

_____

[6]The Secretary of Labor issued new FLSA regulations in 2004.  However, "the new
regulations do not apply retroactively."  Kennedy v. Commonwealth Edison Co., 410 F.3d
365, 369 (7th Cir. 2005).  Therefore, the Court applies the pre-2004 regulations in the
instant action.

undisputed that Plaintiffs earned more than $250 per week, the short test applies.  See 29

C.F.R. § 541.1(f).  Under the short test, Heartland must prove that: (1) Plaintiffs are paid on

a salary basis[7]; (2) Plaintiffs' primary duty consists of management of Heartland's

"enterprise," and (3) Plaintiffs' job duties require them to customarily and regularly direct

the work of two or more other full-time employees.  Id.; see also Murray v. Stuckey's, Inc.,

939 F.2d 614, 617 (8th Cir. 1991) ("Murray I").  "Disputes regarding the nature of an

employee's duties are questions of fact, but the ultimate question whether an employee is

exempt under the FLSA is an issue of law."  Jarret v. ERC Properties, Inc., 211 F.3d 1078,

1081 (8th Cir. 2000) (citing Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714

(1986)).

        The main issue here is whether the primary duty of each Plaintiff was management

of the store in which that Plaintiff worked.  A secondary issue is whether Plaintiffs

regularly directed the work of two or more other full-time employees.  To the extent its

Motion is denied with respect to the exemption issue, Heartland also seeks summary

judgment on the issue of whether the appropriate statute of limitations for Plaintiffs claims

is two or three years.[8]  The Court will address each issue below.

---

[7]That Plaintiffs were paid on a "salary basis" is not at issue here.

[8]Heartland has also moved for summary judgment on the issue of good faith.  The
FLSA authorizes the award of "liquidated"— or double — damages against employers who
violate its provisions.  29 U.S.C. § 216(b).  However, an employer who violates the FLSA
may avoid liquidated damages if it can show that it acted reasonably and with good faith.
Braswell v. City of El Dorado, 187 F.3d 954, 957 (8th Cir. 1999).  The Court concludes
that the good faith issue is not fit for summary disposition; rather, it is a determination
within the Court's discretion to be made by the Court only in the event a jury determines

A.        **Primary Duty**

To qualify under the executive exemption, an employee's primary duty must be

management.  29 C.F.R. § 541.1.  Determining whether an employee's primary duty is

management depends upon "all the facts in a particular case."  29 C.F.R. § 541.103.  "As a

general rule, the regulations provide that if an employee spends over 50% of his time on

managerial duties, his primary duty is management."  Auer v. Robbins, 65 F.3d 702, 712

(8th Cir. 1995).  However, where, as here, an employee does not spend over 50% of her

time on managerial duties[9], she might nevertheless have management as her primary duty if

the other pertinent factors support such a conclusion.  29 C.F.R. § 541.103.  And such an

employee "is not presumed to have a primary duty of nonmanagement."  Auer, 65 F.3d at

712 (citing 29 C.F.R. § 541.103).

The pertinent factors to consider in determining whether a Store Manager's primary

duty is management are the following: (1) the relative importance of the managerial duties

as compared with other types of duties; (2) the frequency with which the employee

exercises discretionary powers; (3) the employee's relative freedom from supervision; and

(4) the relationship between the employee's salary and the wages paid to other employees

---

that Plaintiffs were mis-classified as exempt executives.  See, e.g., Broadus v. O.K. Indus., Inc., 226 F.3d 937, 944 (8th Cir. 2000); Jerrett, 211 F.3d at 1083-84.  Accordingly, Heartland's Motion will be denied with respect to the issue of good faith.

[9]For purposes of these Motions, Heartland assumes that Plaintiffs spent the majority of their time on non-exempt duties, and does not argue otherwise.  (See, e.g., Durbin Mem. in Supp. at 27.)  The Court, therefore, works under the same assumption for purposes of these Motions only.

for the kind of nonexempt work performed by the supervisor.  29 C.F.R. §§ 541.102, 541.103; Auer, 65 F.3d at 712; Murray I, 939 F.2d at 618.  The Court will consider these factors as applied to Plaintiffs.

1.     **The relative importance of the managerial duties as compared with other types of duties**

Heartland argues that the value of Store Managers to the company is in the management duties they perform.  (Cox Mem. in Supp. at 23-25.)  Heartland points to the Store Manager job description and performance evaluations and their eligibility for bonuses based on their store's performance.  (Id.)  In short, Heartland argues that Store Managers are "in charge" of their stores on a day-to-day basis, and thus the value of their management tasks outweighs any value of incidental non-exempt work they perform.  (Id. at 24 (citing Murray I, 939 F.2d at 618).)

Plaintiffs counter that their value to Heartland "was not for any managerial duties [they] may have performed, but for the time . . . spent working on cars and performing other non-exempt work under direct orders."  (Cox Mem. in Opp'n at 33.)  Plaintiffs argue this can be seen from the benefit to Heartland obtained by Plaintiffs' nearly-constant work on non-exempt tasks in order to keep labor costs low, and the corresponding close supervision by the District Managers in the Minnesota region.  (Id. at 34.)

The Court determines that there are genuine issues of material fact with respect to whether Plaintiffs' performance of management duties was of primary importance to Heartland.  For example, Plaintiffs have presented testimony from a former Regional

Manager for Minnesota, Stanley Stebner, that the time Store Managers spent working on cars was more important to Heartland than the management duties they performed. (Stebner Dep. Tr. at 89.)  And a fact-finder could conclude from the evidence that some District Managers used Plaintiffs, and their ability to put in hours doing non-exempt tasks without charging the company overtime, as a mechanism through which to control labor costs.  (See, e.g., Parris Dep. Tr. at 54-55 (Lehman would call at various points throughout the day to check on his labor, would tell him to send someone home, and ask him to stay because he did not "count toward labor").)

The Court also notes, however, that Heartland has presented evidence from which a fact-finder could conclude that the management duties of Plaintiffs were of primary importance.  For example, the opportunity for Store Managers to earn bonuses, and the apparent accountability of Store Managers for the performance of their stores, lends support to Heartland's contention that management was a valued aspect of their duties. These issues have to do with the nature of Plaintiffs' job duties, see Jarrett, 211 F.3d at 1081, and are for a fact-finder to resolve.  Accordingly, this consideration in the primary duty analysis weighs against granting the summary judgment motions.

**2.      The frequency with which the employee exercises discretionary powers and the employee's relative freedom from supervision**

Under the circumstances of this case, the "discretionary powers" and "freedom from supervision" factors are best analyzed together.  The disputed facts pertaining to these considerations constitute the gravamen of this dispute; both Plaintiffs and Heartland

12

present extensive testimony relevant to these issues <u>and</u> interpret this often contextualized and ambiguous testimony in completely dichotomous ways.

While there is no hard and fast analysis to be applied with respect to these factors, some guidance may be gleaned from the Eighth Circuit's decision in <u>Murray v. Stuckey's, Inc.</u>, 50 F.3d 564, 569-70 (8th Cir. 1995) ("<u>Murray II</u>").[10]  First, the implementation of "standardized procedures and policies" does not necessarily eliminate the discretion of an on-site manager of "an isolated store"; second, "active supervision and periodic visits by a regional manager do not eliminate the day-to-day discretion of the on-site store manager"; and third, tasks such as hiring other employees, scheduling other employees, training and disciplining other employees, ordering store inventories, and handling customer complaints are supportive of the applicability of the executive exemption.  <u>Id.</u> at 570.

There is extensive deposition testimony on these factors and, as mentioned above, there is no agreement between the parties as to what conclusions can be drawn from Plaintiffs' testimony.  For example, with respect to Tarras, Heartland states that he "admits he participated in the process of hiring new employees.  He conducted first interviews of applicants, referred, and made recommendations to his District Managers regarding individuals he considered to be good candidates."  (Tarras Mem. in Supp. at 27.)  Regarding the same topic, Plaintiffs state that Tarras's District Managers "made all the management

---

[10]While the Eighth Circuit in <u>Murray II</u> was considering the plaintiffs' exercise of discretionary powers in the context of the "long test," 50 F.3d at 566, the Court considers the <u>Murray II</u> analysis helpful in considering the "discretionary powers" and "freedom from supervision" factors of the primary duty analysis.

decisions with respect to staffing, hiring, promoting, disciplining, and firing. . . . Tarras's

only role in the store's hiring process was to do an initial ten minute 'are you available'

interview. . . . Plaintiff was required to pass along all applications, without consideration of

his opinion of the applicant." (Tarras Mem. in Opp'n at 21.)

Tarras's testimony was that all applicants "had an initial interview, just kind of a 10-

minute 'what's your availability, what can you do.' And applicants went to the next level up

[the District Manager], and they made the decision whether or not to hire them." (Tarras

Dep. Tr. at 64.) He stated that he did give input regarding some applicants, although "[i]t

didn't always make any difference." (Id.) He also stated that he was required to pass on

every applicant to his District Managers, and so did not perform any screening of applicants

in that respect. (Id. at 65.)

Similarly, on the issue of scheduling employees, the parties interpret the same

testimony in vastly different ways. For example, Heartland states that Tarras "admits he

prepared employee work schedules. Tarras's employees understood that Tarras, as the

Store Manager, had to approve time off requests." (Tarras Mem. in Supp. at 28.) Plaintiffs,

on the other hand, state that "District managers . . . decided how many labor hours were

allowed on any given day. They decided who could have time off, monitored the

employees' attendance, and made daily adjustments to the staff based on the labor budget

and who showed up for work. [Tarras's] role in scheduling employees was limited to

preparing the schedule according to district manager direction and then submitting the

schedule to the district manager for approval." (Tarras Mem. in Opp'n at 22.)

14

Tarras's testimony indicates that he prepared an initial schedule for his store based on the number of hours the District Managers determined he would need on a given day. He would then submit those schedules to his District Manager, who would then "adjust [the] schedule" as necessary.  (See Tarras Dep. Tr. at 81-86; see also id. at 83 ("schedules would go to your supervisor and they'd dissect it").)  It also indicates that he did not have any control over one large aspect of the scheduling at his store—the decision on a daily basis whether or not to send employees home or keep them at the store as they had been previously scheduled.  (Id. at 81.)  According to Tarras, every day his District Manager would call and get statistics regarding the level of business for that day and, depending on the news, would then direct Tarras to send some employees home and would specify which employees should go.  (Id.)

This brings the Court to an overarching theme that is present for most of the Plaintiffs—namely, the close involvement of their District Managers with the daily operations of the stores.[11]  Cox, Klipple, Smith, Tarras, and Willson each had District Managers who were at the stores almost every day of the week for hours at a time.  (Cox Dep. Tr. at 55-56, 79 (Gnat came to his store "almost daily," and would stay for "a couple hours"; Lehman came to his store "daily" and stayed from one to three hours); Klipple Dep. Tr. at 37-40 (Lehman stopped by his store "every day to every two days" and later "once every three to four days"); Smith Dep. Tr. at 50, 67 (Lehman came to her store "pretty

_____

[11]The Court notes that the factual similarity between some of the Plaintiffs on this point seems to correspond to a shared District Manager or two, rather than a company policy.

much . . . every day that [she] worked" for 30 minutes to eight hours, and Rainer came to

her store every day for 30 minutes to all day); Tarras Dep. Tr. at 109-113 (Lehman came to

the Fridley store almost every day for two to three hours at a time, and Gnat would come to

his store every day and stay for one to four hours); Willson Dep. Tr. at 36-37 (Lehman

stopped by his store "daily" and stayed for one to two hours).

Some of the District Managers also kept in seemingly constant contact with

Plaintiffs over the phone (Cox Dep. Tr. at 56, 79 (on top of daily visits from both District

Managers, he talked to Gnat on the phone three to five times a day and Lehman on the

phone "about four times a day, sometimes eight.  He called a lot."); Klipple Dep. Tr. at 38-

39 (on top of frequent visits from Lehman, he would talk to Lehman on the phone "every

hour"); Willson Dep. Tr. at 37 (on top of daily visits from Lehman, he would talk to

Lehman "two, three times a day, plus [Lehman] would talk to [the] assistant manager a

couple of times through the night, too").)

The point of these store visits and conversations with the District Managers

generally seems to have been to determine whether a Store Manager's labor was within

budget.  If a given store was not performing well for the day, the District Manager would

instruct the Store Manager to send home one or more employees, and would often

determine which employee to send home.  (See, e.g., Cox Dep. Tr. at 251 (testifying that he

was instructed by his District Manager to send home hourly employees for the purpose of

reducing labor costs every day); Klipple Dep. Tr. at 38 (Lehman would "call every hour to

get numbers and let you know if you had to send some people home or not"); Parris Dep.

Tr. at 54-55 (Lehman would call at various points throughout the day to check on his labor, would tell him to send someone home, and ask him to stay because he did not "count toward labor").)

This is by no means an exhaustive discussion of the fact issues presented by the parties relating to these issues.   However, Plaintiffs have presented evidence which, when viewed in the light most favorable to them, sets their cases apart from Murray I and Murray II in some respects.  For example, the regional managers in the Murray cases "visited their various stores periodically and communicated with the store managers by telephone on at least a weekly basis."[12]  Murray I, 939 F.2d at 616; see also id. at 619 (describing the active supervision by regional managers as "traveling to each store from time to time and communicating by phone with store managers at least weekly" (emphasis added)).  The stores at issue in the Murray cases were "isolated" and store managers were responsible for "hiring sufficient . . . workers to staff the store."  Id.; Murray II, 50 F.3d at 570.  And the store managers in the Murray cases scheduled their employees' hours.  Murray II, 50 F.3d at 570.

The Court must also note, however, that Heartland has presented evidence regarding these same issues which would allow a fact-finder to determine that Plaintiffs (or some of

---

[12]Furthermore, the regional managers in the Murray cases were responsible for 10 to 20 stores.  While there is evidence that at one point Lehman supervised more than 10 stores, it seems that typically he and the other regional managers at issue here supervised between 5 and 10 stores.

them) did exercise discretion, and were sufficiently free from supervision.[13]   Heartland has

also presented some evidence to suggest that some of the close supervision by Lehman and

other District Managers was due to the poor job performance of some of the Plaintiffs.

These are issues of fact regarding the nature of Plaintiffs' job duties and, accordingly, these

factors, too, weigh against granting Heartland's Motion.

### 3. The relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the supervisor

According to Plaintiffs' own calculations, Heartland paid Plaintiffs from $1.11 per

hour to $5.68 per hour more than the average assistant manager in Minnesota.  (See

generally Mems. in Opp'n; Srey Aff. Ex. 9.)  Plaintiffs' calculations were obtained by taking

the average weekly salary each Plaintiff earned as a Store Manager, and dividing it by that

---

[13]This is particularly true with respect to Plaintiffs Durbin and Parris, as their
testimony indicates they were subject to significantly less supervision by Lehman and other
District Managers than the other Plaintiffs.  (See supra pp. 4-5.)  In fact, Parris submitted a
resume to an internet job site, in which he touted his managerial skills and the work he did
as a Store Manager.  (Jones Aff. (Parris) Ex. 5.)  On his resume, Parris represented his
experience as a Store Manager as having more power and discretion than he testified to at
his deposition.  His entry regarding his experience as a Store Manager reads as follows:
> Hire, manage, and lead a team of 14 employees; Establish and implement
> recruiting, training, and operating procedures; Develop cost of goods
> valuation inventory reports to obtain profitability milestones; Develop and
> implement safety procedures to comply with OSHA safety standards;
> Managed multi-vender inventory system to facilitate JIT supply chain
> practices.

(Id.)  But see Ale v. Tennessee Valley Auth., 269 F.3d 680, 688-90 (6th Cir. 2001) (noting
that "resumes may not provide the most accurate picture of an employee's job because
resumes are typically designed to enhance the employee's duties and responsibilities in
order to obtain a job" and that "courts must focus on the actual activities of the employee in
order to determine whether or not he is exempt" (citations omitted)).

Plaintiff's estimated hours worked per week.  The calculations also take into account the bonuses received by each of the Plaintiffs.  According to these calculations, Plaintiffs were paid the following hourly wages during their time as Store Managers:

(1) Cox earned approximately $13.77 per hour (compared to wages of $10.29 (assistant managers) and $7.94 (lube technicians) per hour), which is $3.48 more per hour than the average assistant manager (Cox Mem. in Opp'n at 30);

(2) Durbin earned approximately $12.98 per hour (compared to wages of $10.55 (assistant managers) and $8.05 (lube technicians) per hour), which is $2.43 more per hour than the average assistant manager (Durbin Mem. in Opp'n at 24);

(3) Klipple earned approximately $13.23 per hour (compared to wages of $10.29 (assistant managers) and $7.94 (lube technicians) per hour), which is $2.94 more per hour than the average assistant manager (Klipple Mem. in Opp'n at 24);

(4) Parris earned approximately $11.83 per hour (compared to wages of $9.98 (assistant managers) and $7.85 (lube technicians) per hour), which is $1.85 more per hour than the average assistant manager (Parris Mem. in Opp'n at 26-27);

(5) Smith earned approximately $11.88 per hour (compared to wages of $10.53 (assistant managers) and $8.10 (lube technicians) per hour), which is $1.35 more per hour than the average assistant manager (Smith Mem. in Opp'n at 33-34);

(6) Tarras earned approximately $16.28 per hour (compared to a wage of $10.60 (assistant managers) per hour), which is $5.68 more per hour than the average assistant manager (Tarras Mem. in Opp'n at 32-33); and

(7) Willson earned approximately $11.66 per hour (compared to wages of $10.55 (assistant managers) and $8.05 (lube technicians) per hour), which is $1.11 more per hour than the average assistant manager (Willson Mem. in Opp'n at 24).

Heartland counters that flat weekly rates of pay should be used to compare the wages Store Managers were paid to those of assistant managers and lube technicians.  (See Willson Mem. in Supp. at 20-22.)  Taking Willson, for example: under Heartland's calculation, Willson earned $721.15 per week, compared to $415 per week for assistant managers and $320 per week for lube technicians.  (Id. at 21.)  This view of Willson's salary suggests a greater pay disparity between Willson and the next highest paid hourly employee than the calculations used by Plaintiffs (showing a disparity of $1.11 per hour).  Furthermore, Heartland points out that Willson earned $6,700 in bonuses during his employment as a Store Manager.

The Court determines that, while this evidence appears to weigh in favor of a determination that Plaintiffs' primary duty was management, it must be considered by a jury together with the other evidence relevant to the primary duty analysis.

### 4.      Conclusion

Having considered all of the factors relevant to the primary duty analysis, the Court concludes that there are genuine issues of material fact with respect to the nature of Plaintiffs' job duties.  See Jarrett, 211 F.3d at 1081.  Accordingly, summary judgment regarding Plaintiffs' exemption classification is not proper.

### B.      Supervising Two or More Employees

In order to qualify as an exempt executive under the FLSA, an employee, in addition to having management as his primary duty, must also supervise the equivalent of two or more full-time employees. See 29 C.F.R. § 541.1(f); Murray II, 50 F.3d at 566. The regulations provide that "[a]n employee will qualify as an 'executive' under § 541.1 only if he customarily and regularly supervises at least two full-time employees or the equivalent." 29 C.F.R. § 541.105(a). The regulations make clear that "this criterion is met if an employee supervises several part-time employees whose total hours of work are the equivalent of two full-time employees." Murray II, 50 F.3d at 567, n.2 (citing 29 C.F.R. § 541.105(a)). Thus, if an employee "customarily and regularly" supervises two or more employees who, combined, work at least 80 hours per week, this criterion is satisfied. See id. at 568. In this context, "customarily and regularly signifies a frequency which must be greater than occasional but which, of course, may be less than constant." Id. (internal quotation omitted).

Plaintiffs argue that they do not satisfy this criterion because they were "neither required, nor physically able, to direct the work" of the employees at their stores. (See Willson Mem. in Opp'n at 36.) This argument is not specific to the number of employees who worked at the various stores Plaintiffs managed, but is aimed at the nature of the work Plaintiffs performed. To the extent that this determination is dependant on the issues of fact raised with respect to Plaintiffs' primary duty analysis, the Court concludes that it presents issues of fact regarding the nature of Plaintiffs' job duties for a jury. See Cowan v. Treetop Enters., Inc., 120 F. Supp. 2d 672, 692 (M.D. Tenn. 1999).

However, Plaintiffs also argue that certain of them (Parris, Klipple, Tarras, Cox, and Willson) did not work with two or more subordinate employees at all times.  Thus, they argue that there are triable issues of fact as to the number of employees they supervised. Heartland counters with evidence showing that the average weekly labor hours at each of the those stores were well over the 80 hours of work required for this criterion.[14]  (For example, compare Klipple Dep. Tr. at 63 ("Nine times out of ten I was one of the two employees when I was there."), with Oatman Aff. ¶¶ 20-22 (showing number of hours worked per week at the Edina store was always more than 80); compare Cox Dep. Tr. 107 (at the Hastings store "many, many times, it was just me and one other person"), 238 (at the Hastings store, stating "I was sometimes by myself with one other employee"), with Oatman Aff. ¶ 25 (showing average of 134 hourly labor hours per week at the Hastings store); compare Tarras Dep. Tr. at 146 (at Hopkins, having a total of only two people staffing the store (including himself) "was an everyday occurrence"), with Oatman Aff. ¶¶ 20, 21, 24 (the average labor hours for that store during the time Tarras was the store manager was 230.9 labor hours per week).)

While the Court credits the testimony of these Plaintiffs to the effect that, at times, they worked with only one other person in their stores, there is no requirement that, in order to supervise an employee, a manager must be constantly physically present at the store with that employee.  See, e.g., Baldwin v. Trailer Inns, Inc., 266 F.3d 1104, 1117 (9th

---

[14]Heartland's calculation of weekly labor hours in a given store takes into account only non-exempt hourly work—Plaintiffs' hours are not included in those calculations.

Cir. 2001) (noting that the plaintiffs' "continuous simultaneous physical presence with the assistant managers is not an essential requirement of supervision as long as the [plaintiffs] supervised the assistant managers' work in other ways" (citation omitted)).  Furthermore, Heartland presented evidence, with respect to each Plaintiff, showing that the average number of weekly labor hours worked at the stores were always well over the 80 hour minimum.  This leads the Court to conclude that there are no genuine issues of material fact with respect to the number of employees Plaintiffs supervised and Heartland is entitled to summary judgment on this aspect of Plaintiffs' claims.

**C.    Extension of the Statute of Limitations based on Willful Violations**

Ordinarily, a violation of the FLSA is subject to a two-year statute of limitations. See 29 U.S.C. § 255.  However, the statute of limitations may be extended to three years if the employer's violation is willful, i.e., the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by statute."  McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1998); see also Jarrett, 211 F.3d at 108.  Plaintiffs bear the burden of showing that Heartland's conduct was willful for purposes of extending the statute of limitations from two to three years.  Bankston v. State of Ill., 60 F.3d 1249, 1253 (7th Cir. 1995) (citation omitted).

In support of their position that summary judgment is not appropriate on the issue of willfulness, Plaintiffs argue that the fact that they spent the majority of their time working on cars "was of no secret" to Heartland.  (See, e.g., Cox Mem. in Opp'n at 38.)  They also point to the fact that Heartland was audited by the Department of Labor (the "DOL") in

early 2001 regarding the classification decision Heartland made with respect to its Store

Manager <u>Trainee</u> position.  (<u>Id.</u> at 39; <u>see</u> Audit Letter.)  The DOL determined that

Heartland had improperly classified the Store Manager Trainee position as exempt from

overtime under the FLSA, and ordered Heartland to pay overtime wages to those

improperly classified employees.  (<u>Id.</u>)  In a letter to Heartland notifying the company of its

determination, the DOL also stated that once the Store Manager Trainees "become Store

Managers they would qualify for an exemption."  (<u>Id.</u>)  However, as argued by Plaintiffs,

"the DOL <u>did not</u> perform an investigation or issue an opinion as to whether the <u>store</u>

<u>manager position</u> was properly classified as exempt."  (Cox Mem. in Opp'n at 39 (emphasis

in original).)

 The Court agrees with Plaintiffs that the single statement in the DOL letter

regarding the Store Manager position does not automatically legitimize their exemption

status, given that there is no evidence that the DOL actually examined the Store Manager

position in the course of its audit.  However, while the letter does not automatically

legitimize the exemption classification, neither does it suggest that Heartland was in error

in generally classifying the Store Manager position as exempt under the FLSA.  Therefore,

the Court determines that the DOL audit letter does not raise a triable issue of fact as to

whether Heartland knew that its conduct was prohibited by law or acted with reckless

disregard of the law in classifying Store Managers as exempt.  See <u>Jarrett</u>, 211 F.3d at 108.

 Furthermore, the Store Manager job description and performance evaluation, while

not conclusive evidence that the exemption determination was correct, lend support to

Heartland's position that it generally expected Store Managers to perform primarily management tasks. That Plaintiffs have raised issues of fact as to the nature of their job duties under a particular set of District and Regional Managers, does not raise a triable issue of fact as to whether Heartland acted in reckless disregard of the law in classifying the Store Manager position as exempt.

Finally, Heartland's awareness that Plaintiffs spent the majority of their time on non-exempt tasks does not support Plaintiffs' argument on willfulness, given cases such as Murray I, 939 F.2d 614, and Murray II, 50 F.3d 564. See Cowan, 120 F. Supp. 2d at 697 (noting that plaintiffs' recovery must be limited to the two-year period immediately preceding the filing of the action given case law "involving similar employees in similar settings"). Accordingly, the Court determines that Plaintiffs have not raised a genuine issue of material fact with respect to the willfulness issue, and Heartland's Motions as to willfulness will be granted; any recovery by Plaintiffs will be limited to the two-year period immediately preceding their filing of this action. See Cowan, 120 F. Supp. 2d at 697.

**Conclusion**

25

Based on the foregoing, and all of the files, records and proceedings herein, it is

**ORDERED** that Heartland's Motions for Summary Judgment (Doc. Nos. 215, 219, 220, 228, 234, 244, 248) are **DENIED** with respect to the issues of classification and good faith, and **GRANTED** with respect to the issue of willfulness.

This matter will be placed on the undersigned's June 2006 jury trial calendar, and an order scheduling the submission of trial materials will follow.


Dated: March 6, 2006                            s/Richard H. Kyle
                                                RICHARD H. KYLE
                                                United States District Judge